**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 20-CR-814** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **ARSENIO SMITH,** | |
| **Defendant** | **MEMORANDUM OPINION AND ORDER** |

This matter is before the Court on the Motion for Revocation of Magistrate's Detention Order filed by Defendant on January 22, 2021 ("Defendant's Motion"). (Doc. No. 27.) On February 1, 2021, the United States of America filed its Response in Opposition to Defendant's Motion ("the Government's Response"). (Doc. No. 29.) On February 10, 2021, Defendant filed his Reply to the Government's Response ("Defendant's Reply"). (Doc. No. 32.) For the reasons set forth below, Defendant's Motion is denied.

**Facts**

At the detention hearing conducted on December 17, 2021 before Magistrate Judge Carmen E. Henderson, the Government proffered the Pretrial Services Report[1] that includes the following information. As to Defendant's History/Residence/Family Ties, and as an initial matter, the Pretrial Services Officer reported that the information was provided by Defendant telephonically and although attempts were made to verify Defendant's personal information, those attempts had been unsuccessful and therefore, the information concerning Defendant's History/Residence/Family Ties was not verified.

[1] Transcript, p. 7, lines 17-20.

Defendant reported that he has been a lifelong resident of Cleveland and currently lives, and has lived for the past 8 years, with his girlfriend and their son in Cleveland, and can return to that residence if he is released on bond. Defendant stated that he purchased a home in Bedford in January of 2020 and plans to move into that house once he has completed rehabilitation of it. According to Defendant, he has two children who live in Cleveland, received his GED in 2005, does not possess a passport and has never traveled outside the United States.

Defendant reported that he was unemployed for the seven months prior to his interview and received unemployment benefits of $1200 per month during that time. Prior thereto, he worked for three years as a welder for Big Block Racing. Defendant reported $20,800 in assets, a monthly income of $1200, and monthly expenses totaling $980, resulting in a net monthly cash flow of $220.

As to Defendant's prior criminal record, a criminal record check revealed the following conviction history. Defendant has five convictions for drug trafficking, two convictions for attempted drug trafficking, two convictions for tampering with records, one conviction for drug possession, one conviction for attempted drug possession, and one conviction for possessing criminal tools.[2] Also, he was found to have violated the terms and conditions of his probation in 2012, and had two probation violation hearings in 2018, but was continued on probation. In 2019, Defendant failed to appear for yet another hearing for an alleged probation violation, but it appears he may have failed to appear for medical reasons.

Defendant's Pretrial Risk Assessment is Category 4. The Pretrial Services officer's recommendation was that "[t]here is no condition or combination of conditions that will reasonably

[2] In Defendant's Motion, it is incorrectly asserted that "a careful review of [Defendant's] record as set forth in the Pre-Trial Services Report reflects that [Defendant's] prior drug offenses of conviction were almost all crimes of attempt." (Doc. No. 27, PageID # 128.)

assure the appearance of the defendant as required and the safety of the community", and therefore, the U.S. Pretrial Services and Probation Officer recommended that Defendant be detained.

At the detention hearing, the Government also proffered, with the agreement of defense counsel, certain facts that gave rise to the indictment.[3] They include the following. The case arose out of a shooting that took place at an apartment on Chevrolet Boulevard in Parma, Ohio. Police responded to a report of shots fired, obtained a search warrant for the apartment, searched it, and found a large amount of drugs sitting on a kitchen table in a shopping bag.[4] The search also resulted in finding documents indicating that Defendant was in the apartment, and Defendant's clothes, prescriptions, and medical supplies.[5] Also found were blenders, baggies, "all the tools that one would need to process drugs."[6] Approximately $74,000 was located concealed inside the apartment.[7] The lab reports from the drugs came back as approximately 895 grams of drugs, of which 605.25 grams were a mixture of carfentanil and heroin, and 290.38 grams were heroin.[8]

When a Parma police detective spoke to Defendant by phone, Defendant admitted that the medical supplies in the apartment were his because of a recent injury he had suffered, but Defendant stated that he had not been in the apartment for a few days.[9] DNA found on the mixer with residue and a set of bags found in the kitchen near the drugs matched Defendant's DNA, but did not match the DNA of the person police believe was shot inside the apartment.[10] Defendant's

[3] Transcript, p. 7, line 25, p. 8, lines 1-4.
[4] Transcript, p. 8, lines 5-12.
[5] Transcript, p. 8, lines 13-17.
[6] Transcript, p. 8, lines 18-19.
[7] Transcript, p. 8, lines 24-25.
[8] Transcript, p. 8, lines 20-21. In the Government's Response, counsel for the Government stated that she had inadvertently stated at the detention hearing that there was a total of 895 grams of carfentanil. She then clarified that the total weight of the drugs was 895 grams, 605.25 grams were a mixture of carfentanil and heroin and 290.38 grams were heroin. (Doc No 29, PageID # 133.)
[9] Transcript. P. 9, lines 1-6.
[10] Although at the hearing, the Government represented that Defendant's DNA matched the DNA on the bag that contained the drugs, in the Government's Response the Government acknowledged that that representation was a mistake, and that the DNA found on the mixer with residue and a set of bags found in the kitchen near the drugs was a probable match to Defendant's DNA. (Doc. No 29, PageID # 134.)

subpoenaed 2013 to 2018 tax returns demonstrated that he had not filed any taxes for those years.[11] Without having any medical records, the Government advised Magistrate Judge Henderson that it believed Defendant's recent injury was from a shooting.[12]

Defendant's counsel represented that since the incident of the shooting at the apartment on January 4, 2020, Defendant, through counsel, had been in constant contact with law enforcement authorities to determine the status of the case, and when the indictment was unsealed counsel made arrangements to self-surrender Defendant, eliminating any concern that Defendant is a flight risk.[13] Defense counsel argued that there was only one alleged incident dating back nearly a year prior, as distinguished from any kind of ongoing conspiracy, and no alleged misconduct, specifically including drug trafficking, between January 4, 2020 and the detention hearing, meaning that Defendant does not pose any kind of clear and present or imminent danger to the community.

Defendant's counsel also asked Magistrate Judge Henderson to consider the "litany of letters from people familiar with [Defendant], one of whom he worked with at a trucking company as a mechanic until the COVID-19 struck, where he was actively working, repairing cars and towing cars, and this gentleman was kind enough to say, if released he'll put him right back to work."[14] Defendant's counsel argued that under these circumstances, i.e., employment,

[11] Transcript, p. 9, lines 16-21.

[12] Transcript, p. 10, lines15-22.

[13] Transcript, p. 11, lines 11-25, p. 12, lines 1-7. Defendant submitted an Affidavit of Counsel of Record for Defendant, Myron Watson, wherein Mr. Watson averred that beginning in early January, 2020 until Defendant's arrest, he had been in contact with Defendant discussing the possibility that the drug trafficking investigation, and subsequent filing of state drug charges, would end up in federal court; that when counsel discovered that a felony warrant in Parma Municipal Court had been issued for Defendant's arrest, Mr. Watson contacted Parma police and arranged for Defendant to self-surrender and Defendant did so on June 10, 2020; that upon learning that Defendant would be charged federally, Mr. Watson began to make inquiries to federal law enforcement agencies to confirm whether federal charges had been filed; and a detective from the U.S. Marshals Service and Mr. Watson had discussions between December 7, 2020 and December 11, 2020 when Defendant did self-surrender, culminating in the detective advising Mr. Watson that he would be available December 10 or December 11, 2020 to have Defendant self-surrender. (Doc. No. 15-2, PageID # 56.)

[14] Transcript, p. 14, lines 9-14. At the detention hearing, Defendant submitted five letters for the Court's consideration: one from Defendant's fiancé (Doc. No. 15-1); one from Robert Wilson, who represented that he is the owner of Big Block and Defendant had worked with his company on two different occasions, one when he was in the halfway house

Defendant's ability to reside with his fiancé, a registered nurse, and have her vouch for his appearance, and because Defendant had retained counsel to fight these charges, there were reasonable conditions of release that would ensure Defendant's appearance.[15] Defendant's counsel then went on to challenge the strength and/or reliability of the evidence against Defendant, to include specifically arguing that there is photographic evidence demonstrating that the person entered the home invasion with a bag and that the contraband was actually found in that bag.[16]

The Government acknowledged that the letters and declarations submitted to the Court concerning Defendant were relevant to his family ties and connection to the community and might rebut the presumption that Defendant is a flight risk, but argued that they did not rebut the presumption that Defendant was a danger to the community.[17] And, according to the Government, even if the Court concluded that Defendant had rebutted the presumption of both prongs, to include the danger to the community, the other 3142 factors, including the nature and circumstances of the offense, i.e., that it involved a controlled substance, warranted Defendant's detention.[18] Moreover, the Government argued that the sentence that Defendant faced if convicted, i.e., a mandatory term of imprisonment of 10 years and a maximum of life imprisonment, and the potential for being determined a "career offender" based upon his criminal history, might give him incentive to flee.[19] The Government also argued that Defendant's undisputed criminal history, demonstrating that he has been a drug trafficker since he was 19 years old, makes him a danger to the community.[20] The

---

and another prior years back," and that he was looking forward to having Mr. Smith back (Doc. No 15-3, PageID # 58.); one from Defendant's God sister (Doc. No 15-4); one from a deputy officer for the County (Doc. No. 15-5); and one from a life-long friend of Defendant (Doc. No. 15-6). It is important to note that Mr. Wilson's representations concerning when Defendant was allegedly employed by him do not coincide or comport with what Defendant reported to Pretrial Services.

[15] Transcript, p. 15, lines12-17.

[16] Transcript, p. 15, lines 18-25, p. 16, lines 1-5.

[17] Transcript, p. 20, lines 11-18.

[18] Transcript. P. 21, lines 1-6.

[19] Transcript, p. 22, lines 2-20.

[20] Transcript, p. 23, lines 4-7.

Government also questioned the validity of Defendant's claimed employment and opportunity for employment with Big Block based solely on a letter, particularly given the fact he had not filed tax returns between 2013 and 2018.[21] The Government pointed to the fact that $74,000 had been found in the apartment and the fact that despite being unemployed and collecting unemployment for seven months, he was able to retain three lawyers to represent him, meaning that Defendant has an illicit source of funds that is not being disclosed or there is a very financially strong third party that has an interest in paying for Defendant's representation.[22] Finally, the Government asked the Court to consider Defendant's prior non-compliance with bond and probation.[23]

In rebuttal, Defendant's counsel commented again upon the evidence expected to be uncovered through discovery to challenge Defendant's connection to the drugs and money located at the apartment which was not registered to Defendant, and reminded the Court that Defendant is presumed innocent.[24] Defendant's counsel also reminded the Court that in his letter, Mr. Wilson had provided his telephone number for verification of the information contained in his letter.[25]

Magistrate Judge Henderson correctly found that there is a statutory presumption in favor of detention in this case and that Defendant has the burden of rebutting that presumption.[26] But, Magistrate Judge Henderson also concluded that Defendant had rebutted the presumption concerning both risk of flight and danger to the community.[27] She then evaluated the 3142(g) factors to determine whether or not the Government had met its burden by proving by clear and

[21] Transcript, p. 23, lines 8-25, p. 24, line 1.
[22] Transcript, p. 24, lines 2-10. It is interesting to note that one of Defendant's lawyers is located in Los Angeles, California.
[23] Transcript, p 24, lines 21-25, p. 25, lines 1-4
[24] Transcript, p. 26, lines 1-25, p. 27, lines 1-8.
[25] Transcript, p. 27, lines 16-18.
[26] Transcript, p. 28, lines 9-11.
[27] Transcript, p. 28, lines 9-23.

convincing evidence that there was no condition or combination of conditions that would reasonably assure the safety of other persons or the community.

Magistrate Judge Henderson concluded that the nature and circumstances of the offense, i.e., 895 grams of carfentanil, and the fact that the offense carries a ten-year mandatory minimum, weighed in favor of detention.[28] She concluded that the strong weight of the evidence against Defendant and his long history of drug trafficking over 12 years weighed in favor of detention.[29] As to the history and characteristics, Magistrate Judge Henderson acknowledged and considered Defendant's strong family ties that weighed in his favor, but questioned his employment claim and considered the fact that even if he had been employed, Defendant was allegedly continuing to engage in drug trafficking during his employment, meaning that employment did not prevent him from engaging in drug trafficking.[30] Magistrate Judge Henderson also considered Defendant's prior bond violations and his failure to appear.[31] She noted the dangerousness of carfentanil and the circumstances of the arrest, i.e., a home invasion.[32] Magistrate Judge Henderson acknowledged that Defendant's fiancé had agreed to serve as Defendant's custodian but found that his release to the custody of his fiancé would not guarantee that Defendant would not continue to possess and/or sell carfentanil, and preclude him from being involved in shootings and home invasions.[33] Based upon her consideration of these factors, Magistrate Judge Henderson found that the Government had met its burden by clear and convincing evidence that there are no conditions that will reasonably assure the safety of other persons and the community and ordered Defendant detained.[34] Defendant's Motion followed.

---

[28] Transcript, p. 29, lines 3-18.
[29] Transcript, p. 29, lines 19-25, p. 30, lines 1-2.
[30] Transcript, p. 30, lines 3-23.
[31] Transcript, p. 31, lines 8-10.
[32] Transcript, p. 31, lines 11-21.
[33] Transcript, p. 32, lines 12-20.
[34] Transcript, p. 32, lines 8-11.

**Discussion**

18 U.S.C. § 3145(b) provides:

> (b) Review of a detention order.—If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. ***

District courts exercise *a de novo* review of a magistrate judge's release or detention order. *United States v. Fitzhugh*, 2016 WL 4727480 (E.D. Mich Sept. 12, 2016) (citations omitted). "[A] district court should fully reconsider a magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion". *United States v. Leon*, 766 F.2d 77, 80 (2nd Cir.1985).

Title 18 U.S.C. § 3142 "provides the framework for the district court's analysis as to whether release pending trial is proper." *United States v. Williams*, 2020 WL 2529356 (E.D.Tenn. May 18, 2020) (citing *United States v. Webb*, 238 F.3d 426, at *2 (6th Cir. 2000) (table opinion). "The ultimate touchstone of this analysis is 'whether there are conditions of release that will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community.' § 3142(g)." *Id*. Courts must consider the following: (1) the nature and circumstances of the offense charged, including whether it is a crime involving a controlled substance; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, e.g., his or her character, mental and physical condition, family and community ties, financial resources, criminal history, and substance-abuse history; and (4) the nature and seriousness of the danger posed to the community by the defendant's potential release. *Id*.

In Defendant's Motion and Defendant's Reply urging the Court to set aside Magistrate Judge Henderson's detention Order, Defendant reiterates the same arguments made at the hearing, but makes the following additional assertions and arguments. First, Defendant submits that a third condition, i.e., the financial commitment of $10,000 or more from four of Defendant's relatives to a signature bond will assure his appearance if he is released.[35] Second, Defendant asserts, albeit incorrectly, that the Pre-Trial Services Report reflects that Defendant's prior drug offenses of conviction were almost all crimes of attempt. Therefore, according to Defendant, these crimes of attempt do not count as predicates for career offender status under the U.S. Sentencing Guidelines, as argued or represented by the Government at the hearing.[36] Third, and in effect, Defendant asserts that Magistrate Judge Henderson improperly considered that Defendant's arrest occurred in the aftermath of a home invasion robbery at which gunshots were fired and he may or may not have been wounded as a result of a firefight because, according to Defendant, "there has been no testimony that the defendant was either the perpetrator or victim of that home invasion or that he was involved in any gunfire related to the robbery."[37] Fourth, and finally, Defendant points to the Government's Response wherein it admitted that at the detention hearing AUSA Sweeney had mistakenly stated that Defendant's DNA match was on the bags that contained the drugs; what Defendant submits was "the most compelling evidence that the prosecution provided to the magistrate judge." Thus, according to Defendant, "the magistrate judge issued her detention order based upon an inaccurate overestimation of the strength of the government's evidence," and therefore, this Court must heavily discount Magistrate Judge Henderson's finding on this issue.[38]

[35] Doc. No. 27, PageID #s 126, 127.
[36] Doc. No 27, PageID # 6.
[37] Doc. No. 27, PageID # 129.

In the Government's Response, the Government submits that Defendant has not presented sufficient evidence to overcome the presumption that he is a risk of flight and a danger to the community. However, the Court agrees with Magistrate Judge Henderson that he did present sufficient evidence to rebut the presumption of detention. Nonetheless, and as the Government argues, and Magistrate Judge Henderson concluded, the statutory factors weigh in favor of detaining Defendant because the Court finds that the Government has demonstrated by clear and convincing evidence that Defendant poses a danger to the community and risk of flight.

The nature and circumstances of the offense, possession with intent to distribute over 600 grams of carfentanil and 290 grams of heroin, and the substantial sentence that Defendant faces if convicted weigh in favor of detention. Indeed, the offense Defendant is charged with carries a mandatory ten-year sentence and a maximum sentence of life imprisonment, and if found to be a career offender, given his prior drug trafficking convictions that qualify as career offender predicates,[39] Defendant's advisory sentencing guidelines range will be 262-327 months before any possible reduction for acceptance of responsibility. (Doc. No 29, PageID # 138.)

The weight of the evidence against Defendant also weighs in favor of detention. As the Government correctly points out in its Response, the "weight of the evidence" factor relates to the weight of the evidence of risk of flight or dangerousness, not to the weight of the evidence of Defendant's guilt, citing *United States v. Stone*, 608 F.3d 939, 948 (6th Cir.2010). (Doc. No 29, PageID # 138.) The Court acknowledges and understands that at the detention hearing Magistrate Judge Henderson was incorrectly advised that Defendant's DNA was a probable match to DNA

[39] In the Government's Response, the Government correctly points out that Defendant was convicted in case number 11-546573 of two fourth-degree felony trafficking offenses under § 2925.03(A)(2) and in case number 16-606226 Defendant was convicted of a third-degree felony trafficking offense, also under § 2925.03(A)(2), and the Sixth Circuit "has recently confirmed that Ohio Rev. Code Ann § 2925.03(A)(2) 'falls safely within the …contours" of U.S.S.G. § 4B1.2(b)'s definition of a 'controlled substance offense.' *United States v. Smith*, 960 F.3d 883, 889 (6th Cir.2020)." (Doc. No 29, PageID # 138.)

found on the bag containing the drugs. Nonetheless, Defendant's DNA was a probable match to the mixer with residue and a separate set of bags that was found in the kitchen near the drugs. And, the DNA of another person, R.D., who was located near the apartment and had been shot several times, was not a match to the DNA on these items. Moreover, the drugs, $74,000 in cash, and the tools for processing the drugs were all located in an apartment where Defendant's personal items were located.

The Court also acknowledges and understands that Magistrate Judge Henderson considered the circumstances surrounding Defendant's arrest, specifically "around a home invasion," and she stated that "[n]o matter what part he played in this, there was a clear danger to the community and the people around the defendant are around drugs and people are being shot."[40] Magistrate Judge Henderson also stated that "[t]here's also the fact that the defendant was nursing a wound, whether or not it was a shooting wound,…the Court is worried about situations when there's drugs and guns, particularly a situation where it shows that worry to be true, there's drugs and we have people being shot, we have a home invasion where it's likely that people would invade a home when they know that there's $74,000 in drug money there and drugs."[41] Defendant incorrectly interprets these statements by Magistrate Judge Henderson to mean that she considered Defendant to have actually played a part in the home invasion/robbery and firefight. But, this Court construes Magistrate Judge Henderson's statements as demonstrating a valid concern for the safety of others and the community where at the place Defendant – who reported he was recovering from a gunshot wound - admitted staying, and where items of his personal property, drugs, tools, and $74,000 in cash and ammunition were located, the impetus for the home invasion may very well have been the drugs and money. This Court shares that same concern, while specifically stating that in

[40] Transcript, p 31, lines 18-21.
[41] Transcript, p. 31, lines 22-25, p. 32, lines 1-4.

weighing this factor, the Court is not considering or concluding in any way that Defendant was involved in the home invasion and firefight associated therewith.

The Court also concludes that Defendant's history and characteristics weigh in favor of his detention because they demonstrate that he is a danger to the community. The Court acknowledges that Defendant's life-long residency in the community and his strong family ties in the community, to include a fiancé and two children, as well as immediate and extended family members, mitigate against risk of flight, but they do not mitigate against the dangerousness he poses to the community. Indeed, Defendant's criminal history, to include a history of five felony drug trafficking offenses and two attempted drug trafficking offenses beginning at age 19, and his three violations of probation and bond violations demonstrate that he is a danger to the community and weigh in favor of detention. Moreover, Defendant does have unexplained assets. Although he did not file any taxes between 2013 and 2018 and reported minimal income and receipt of unemployment benefits during the 7 months prior to his arrest, he was able to purchase a home, and has retained two lawyers – including one in California. Moreover, Defendant's claim of employment with Big Block for the three years prior to his receipt of unemployment benefits is contradicted by the times of employment set forth in Mr. Wilson's letter.

The Court also finds that Defendant's release would pose a serious danger to the community. His lifelong residence in the community and family ties, and even any alleged employment, have not prevented Defendant from trafficking in drugs. While the location monitoring that he proposes may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement in the trafficking of controlled substances without detection. Moreover, location monitoring is not a

limitless resource, nor is its installation and monitoring by United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing.

Moreover, with regard to Defendant's concerns about COVID-19 and the potential for contracting the virus, the Court notes that the correctional and medical staff at NOCC-CCA have implemented precautionary and monitoring practices to protect detainees from exposure to the COVID-19 virus. And, as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act, 18 U.S.C. § 3142(g); the nature and circumstances of the offense charged, including whether it involves controlled substances or firearms, the weight of the evidence against the defendant; the defendant's history and characteristics (including history relating to drug abuse, defendant's criminal history, and record of appearing at court proceedings); whether the detainee was on probation, parole, or other court supervision at the time of the alleged offense conduct; and the nature and seriousness of the danger to any person or the community posed by the defendant's release. The Court has weighed all of these factors, considered the record before it and hereby DENIES Defendant's Motion.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
U. S. DISTRICT JUDGE

Date: February 17, 2021